IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

WHEELING DIVISIO

Sharon "Marie" Travis

Appellant,

v. Civil Action No.5:26-cv-00114

Judge Bailey

Deborah Fish

Appellee.

---

# APPELLANT'S OPENING BRIEF

---

Submitted by:
Sharon Travis
930 Main Street
Wheeling, WV 26003

Pro Se Appellant

Date: July, 21, 2026

# TABLE OF CONTENTS

I. CAPTION ....................................................................1.

II. TABLE OF CONTENTS ......................................................... 2

III. TABLE OF AUTHORITIES.......................................................3

IV. STATEMENT OF ISSUES......................................................... 4

V. STATEMENT OF CASE...........................................................8

VI. SUMMARY OF ARGUMENT.............................................. 25

VII. ARGUMENT............................................................................ 29

1. Ombudsman's Missing sixth report and Incomplete record............29

2. Failing to Adjudicate the Entire Motion to Remove and Replace the Ombudsman......................................................... 35

3. Erroneously Holding That a Patient Care Ombudsman Possesses Discretion Over What to Report, Shielding the PCO From Mandatory Reporting Laws on abuse............................................... 39

4. Court using the Ombudsman's uncross-examined reports to make major decisions............................................................... 42

**5.** Error by Declaring the Patient Care Ombudsman a "Neutral and Disinterested" Officer as a Matter of Law, While Ignoring a Detailed Evidentiary Timeline and Documented Proof of Bias and Misconduct.42

6. Mischaracterized falsified seventh report.............................. 47

7. Error in timeline of appellants presence on site.......................... 56

VIII. CONCLUSION............................................................................59

IV. CERTIFICATE OF SERVICE............................................... 60

# TABLE OF AUTHORITIES

## CASES

Anderson v. City of Bessemer City, 470 U.S. 564, 573–74 (1985) ................ 29

Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 405 (1990) ............... 32,39, 45

Greene v. McElroy, 360 U.S. 474, 496–97 (1959) ..................................44

Goldberg v. Kelly, 397 U.S. 254, 269 (1970) .........................................44

Highmark Inc. v. Allcare Health Mgmt. Sys., Inc., 572 U.S. 559, 563 n.2 (2014) 53

Latman v. Burdette,366 F.3d 774(9th Cir. 2002) ........................................................42

Martin, 817 F.2d 175, 180 (1st Cir. 1987) ........................................... 48

Price v. Lehtinen 564 F.3d 1052(9th Cir. 2009) ........................................................42

Stancill v. Hartford Sands Inc. 372 F.3rd 637, 639(4th Cir.2004) ..........................39,46

Southeast Hotel Properties Ltd. Partnership,99 F.3d 151,154(4rth Cir. 1996). 39,47

U. S. Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 405 (1990) .........36,39, 53

United States v. Dillard, 891 F.3d 151, 158 (4th Cir. 2018) ........................ 47

United States v. Moussaoui, 382 F.3d 245, 297 (4th Cir. 2004) ................... 35

United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948) ............53

## RULES

Fed. R. Bankr. P. 2015.1...................................................... 29

Federal Rule of Bankruptcy Procedure 8013............................... 29, 39, 56

Federal Rule of Civil Procedure 52(a) .............................................. 33

Federal Rule of Evidence 801 .......................................................43

Federal Rule of Evidence 802 .......................................................43

Fed. R. Bankr. P. 7052 and 9014 ..................................................34

**STATUTES**

Bankruptcy Abuse Protection Act (2005) ........................................... 37

11 U.S.C. § 333 ......................... 25,27,30,31,34,35.36.38,40, 41,44,47,50,52

11 U.S.C. § 333. (a)(2)(A) ....................................................... 44

**STATEMENT OF ISSUES ON APPEAL PRESENTED**

I. Whether the court erred in a matter of law by not addressing

The motion stating the fact concerning the ombudsman missing 6 reports from the record. The Ombudsman's missing report is a due process violation, denying the material evidence to be a part of the record. Whether the judge therefore made decisions on an incomplete record. Whether the judge failed to make findings of fact regarding core allegations of the PCO purposely remitting the report to conceal evidence in bad faith. Whether the courts made a rational connection between facts found and the choices made. Whether the court omitted the evidence from its findings, and failed to evaluate whether cause existed to remove the POC. The court mentions the Ombudsman is tasked with reporting at least every 60 days. See Rule 11U.S.C.333(2)(b). Whether the court did not conclude that the failure to report her missing 6 reports was a Breach of patient advocacy and monitoring roles

and failing to file violates core Statutory Bankruptcy code 11U.S.C$333. A breach of court–appointed fiduciary duties.

II. Whether the court committed a reversible error by failing to rule on the merits of the entire motion to remove and/or replace the Ombudsman. Whether the court only addressed the "removal" request of the Ombudsman and ignored the "replacement" aspect of the Ombudsman was a denial of due process, a miscarriage of justice, and whether the court abused its discretion by completely bypassing a substantive portion of the legal argument. Whether the court left the ruling on only a fraction of the motion to replace completely lest the rest be unaddressed and unresolved.

III. Whether the court committed an error by misinterpreting and fundamentally misapplying the Congressional intent behind the POC provisions of the Bankruptcy Abuse Prevention and Consumer Protection Act. The Court stated in its denial of the motion that a patient care ombudsman has discretion on what matters are relevant and necessary to report to the court, which essentially shields the POC from Mandatory reporting; refer to 11U.S.C section 333. Whether ignoring evidence showing unreported abuse to shield employee misconduct and evidence that intentionally suppressed active allegations of patient harm. Whether the court committed an error of law concerning Mandatory Reporting laws that override discretion. Whether the court failed to consider the facts presented in the

motion, thereby entering a judgment without evaluating whether elements of the claim were met.

IV. Whether the judge erred in law under the Federal Rule of Evidence 801(c) using the Ombudsman's uncross-examined reports to make major decisions (Making false allegations that led to the loss of her standing as the debtor) that were based mostly on hearsay. Whether the court allowed a due process violation and the due process rights were violated because they were denied the ability to challenge the report's credibility or uncover underlying biases. Whether the court allowed the ombudsman to overstep her role and act as a shadow decision maker, advocating for specific actions rather than serving as an objective, neutral investigator as evidenced in the motion and Timeline. Whether the judge erred in using the weight of the ombudsman's unvetted and uncross-examined reports that led to the removal of the former founder and debtor. court refuses to enforce the PCO statutory duties, whether the court refused to address specific documented evidence concerning impartiality outside her authorized scope, abuse of process, breach of Duty/Misconduct, and committed bankruptcy Fraud constitutes a violation of the right to have matters properly adjudicated. Whether the judge therefore failed to perform their duty of protecting the estate's most vulnerable patients.

V. Whether the Court commits an error of law when stating that the

ombudsman is a neutral and disinterested party, and failed to address the correct legal standard. Calling the disinterested party as though they cannot be biased. Whether the court refuses to enforce the PCO statutory duties, whether the court refused to address specific documented evidence concerning impartiality outside her authorized scope, abuse of process, breach of Duty/Misconduct, and committed bankruptcy Fraud constitutes a violation of the right to have matters properly adjudicated. Whether the judge therefore failed to perform their duty of protecting the estate's most vulnerable patients.

VI. Whether the judge refused to review evidence of abuse, and complaints made by patients in the motion addressing the alleged false 7th report. Believed to have defrauded the court by falsifying her report, intended to mislead the court regarding the trustee's succession and documented in the motion, the patient in the motion that contradicted the false report.

VII. Whether the judge made a factual error. The Court mentions that it has been some time since the appointment of the Trustee, Ms. Travis has been terminated from her role with the Debtor, and that relations between Ms. Travis and the current administration of the estate have substantially deteriorated as a result. Statement of issues: Did the judge rightly state the timeframe of the evidence presented and the statement made on the time that has passed since the appointment of the trustee when the last when her last report was three days earlier, and Sharon Travis was put on leave 3 days later

And fired on May 1st 2026.

## STATEMENT OF CASE

1. Lawsuit against OHFLAC by Serenity Hills Life Center and the person named in the lawsuit still makes decision concerning any complaints and has targeted the CEO. (Doc 70. Timeline 20)
2. On February 27, 2025, the Appellant filed a voluntary petition for Chapter 11. (Doc. 2)
3. On March 3, 2025 proposed order approving counsel Kirk Burkley (Doc. 50)
4. On March 12, 2025 Counsel made motion to wave ombudsman for financial Reasons. This is what the board of directors is told. (Doc. 7)
5. March 18,2025 a hearing is held on a motion to not have an ombudsman and two former staff show up and testify against the debtor.
6. On April 4, 2025 order appointing Health Care Ombudsman. (Doc. 14)
7. On April 11, notice of appearance by Deborah Fish, PCO. (Doc 15)
8. On May 15, 2025 PCO Deborah Fish writes her first report for April and May. She states that the CEO is helping with intake and they need a full-time intake. All staff are dedicated to the residents, their care and successful completion of the program. (Doc. 18)
9. On May 16, 2025 A motion to extend for filing a Chapter 11 Plan. (Doc. 20)
10. Between May and July 2026, we, hired a case Manager M M.

11.On July 17, 2025 the PCO submits her second report and her summary states in its conclusion that patient care has been maintained since her appointment and it is not materially compromised. Although staff turnover remains a challenge, operations are stable and current employees continue to meet the needs of program requirements. She is becoming close with the nurse practitioner (Medical Director) and I as the CEO rarely see her. She does not tell me when she is coming and does not report to me when she is there. (Doc. 23)

12. Between June and August 2025, we hired two new counselors D. J. and C. W.

13.In August the CEO started a new program six-month program that would help would help the Census go up and it started to work, but it would take a few months or so to show the census climbing.

14. On September 17 2025, the PCO files her third report covering July 15th through September 17, 2025. Her conclusion: Pursuant to Section 333(b)(3), patient care has been maintained since my appointment and is not materially compromised. Although staffing remains a challenge, operations are stable as current employees continue to meet resident needs and program requirements. The Debtor has been responsive to my communications and provided access to employees. While improvements are necessary and ongoing, I find that the clinical

and administrative teams remain committed to resident care and program completion. (Doc. 26)

15.September 30th, 2025 via text she is talking about the census needing to go up after telling us not to bring anyone in august, because she thought there was not enough staff (There are no laws on staff to client ratio in WV) We were working on our joint commission certification that we had to have in on October 28th, 2025. The new state law was that if you did not have it by January 1, 2026, then you could not be reimbursed by Medicaid or any insurance. (Doc 70 timeline No. 13, 14 1nd 15)

16. On October 27, 2025 There is an incident with M. M. (Case manager). We had discussed firing her because she was missing her discharges, but we were waiting to find a replacement first. The CEO, Clinical Director and Medical Director were in a meeting and we had a question for the Case manager. The CEO went to the case manager M. M. to ask the question and she got smart with the CEO. The CEO went back to the meeting and stated "we need to let go". When we went back to her office, she was packing up. We thought she quit. That night the CEO received a call from the Mental Health Technicians stating "the patients are crying because the case manager said she was going to cause problems for the facility and get it shut down. They are afraid they will go back to jail". She told

one patient in her office, that she going to take all the files and see how the CEO would like it. (Doc. 70 Timeline 17 Exhibit K)

17.On October 27, 2025 Second motion to extend Exclusive Period for filing a Chapter 11 plan. (Doc. 29)

18.On October 28, 2025 motion to extend objection due. (Doc. 31)

19. On October 28, 2025 the Case Manager M. M.'s key fob access turned of at the facility, so she would not have access to the residents if she tried to come back to the building. She tried to come into the side entry about 4 times and was denied access. She came into the front door and it stated access denied. The company verified this showing she came in unauthorized and went to her office. She began to erase the patients court appointments from the whiteboard and the CEO tried to push her hand lightly away from the board, and said "what are you doing" then let her continue to erase it. She filed a battery charge against the CEO. (Doc. 70 Exhibit L, G, I and C1)

20.October 30, 2025 Serenity Hills Life Center receives their Joint commission Certification. A joint commission review is designed to be one of the most rigorous and comprehensive evaluations in healthcare and to get certified is not an easy task. They focus on patient safety and continuous operational readiness. (Doc.26)

21. November 4, 2025 an investigation is done into the incident with the

Former Case Manager M. M., the video and witness testimony states that she was denied access and that she not only came in to destroy property and the Ceo lightly tried to stop then let her continue, but she also took documents and violated HIPAA and took property out of the building. Patient K. H. reported that the case manager stated while she was in her office" I am leaving and I am taking patients files, and everything and they will see how they would be screwed without her". (Doc 70 Exhibit G. & C1)

22. On November 6, 2026 OHFLAC was called by M. M. Former Case manager. (Doc. 70 Timeline 19 – 24)

23. On November 10, 2025 an objection and a response by the ombudsman to the extension. She makes unvetted accusations to the judge, bringing hearsay to the court and stating the CEO has not done anything get the debtor in a better place and does not mention the new 6-month program or the new Jaco certifications that the CEO had worked on and just received, while bringing in patients. She brings up a hearing concerning her appointment. She discusses the board of directors in a negative manner going by hearsay and the facts that she stated our not true. The CEO is not asked about these prior accusations and PCO has never spoken to the board of directors. She demands a CRO. She abandoned her statutory duty to monitor patient welfare and injected herself into corporate bankruptcy matters. She

does not state the residents are in danger. Her change happened after the incident with the Case Manager M. M. (Doc. 31) (Doc. 70 Timeline 24).

**24.**On or about November 11, 2025 the attorney Berstein and Burkley started reaching out telling the board that we had to get a CRO because the Ombudsman has turned against us and he said some of the things that she was saying. The CEO stated they were not true. He says that it was best because he believed that the judge would not give us an extension if we did not do what she said. We did not want to, but they talked us into it because of what the ombudsman put in her motion to object to the extension. (Doc. 86)

25. November 17, her **fourth** Report. Covering September 17, 2025 to November 17, 2025 Ombudsman again writes a report that is damning to the CEO that she had just on her **third report** had nothing really bad to say. The PCO says the Case manager is fired. The PCO does not mention that the investigation on November 4 and 5th, 2026 found that she had stolen residents' census with their birthdates on it, which is a HIPAA violation, that she destroyed property, broke in the building and said she was going to cause problems for the facility (which was all on camera). This had patients crying for fear the place would get shut down. Instead, she reports that that CEO might have violated HIPAA. She states we did not have Case manager and we just hired one, but we were waiting for her to finish out her two weeks at her job. She reports that the CEO may be holding patients

back even after staff say they can leave. She does not discuss these accusations with the CEO. These unvetted serious accusations of Insurance fraud went out on a public forum in the court record, with no evidence (this is actually impossible, insurance company make the decision on how long they stay), she talks about the intake of residents and the problems which is hearsay from the nursing department, that could have easily been disproved. There are emails showing the nurses had been giving inaccurate information. She says the CEO does not hold a license accreditation to do intake. The CEO's resume was for assistant referrals, and the CEO had told her in the past she had gotten permission from Keith King to do referrals and he was the head of the state addiction program under DHHR. The CEO has documented evidence and witness that this is all not true. The CEO was never asked about these accusations and they went straight to the court. The CEO was not given a chance to prove that they were not true. Some the PCO already knew was not true. (Doc. 32) (Doc. 70 Timeline 25 & 26)

**26.**November 25, 2025 A hearing is held on the extension and the lawyer says that he and the Ombudsman had come to an agreement on getting a CRO. He states though he does not agree with everything she has put in the report. He states that our numbers have increased and had a profit of $45,000 dollars that month and our census is up more than it ever has been and continues. The gentleman from the U.S. trustee office stated that he has been listening to the Ombudsman and that if

we would not have agreed, then he would have ask for a conversion or a dismissal. The judge listening to her and the U.S. attorney was listening to her. (Doc. 86)

27. November 26, 2025 The CEO came in to help fill out papers for the Case management since it was behind. This was to help the counselors since they were helping with case management. They new case manager was being trained. The CEO was told by patients that two of the counselors that were best friends with the former case manager were saying inappropriate things that were upsetting them. Counselor D J and Counselor C W. They said it was affecting their treatment. (Doc. 70 Timeline 27)

28. November 26, 2025 9:30 pm The CEO sent a text message to the PCO Stating “I need to talk to you about the 2 counselors and what they are saying”. (Doc.70 Timeline 27)

29. November 27,2025 8:43 am The CEO texted message the PCO that They were going to commence an investigation and PCO reminds her that they have 39 patients that need therapy. The CEO acknowledges this, but says this is serious stuff. (Doc. 70. Timeline 29)

30.November 28, 2026, CEO texts the PCO and tells her that she will be commencing an investigation and that she had to calm the fears of residents. I told her that she was getting caught up in a web of lies. (Doc. 70 Timeline 30)

31.November 30, 2025, The CEO allows the counselors that will be under

investigation to do groups with someone monitoring them. Usually, something this serious, they are put on leave and stay off sight. The CEO did not allow them to do individuals. The CEO allowed this for the resident's sake. (Doc. 70 Timeline 33).

32.November 30, 2025 The CEO text the PCO to tell her they need to talk and that she does not know if it is worse to keep them or fire them. The CEO says" I have two statements from residents and it is bad". The PCO says that she would immediately have to decrease my census. Insinuating she had power to do that. (Doc. 70 Timeline 32)

33.November 30, 2025, The CEO has the utilization nurse do an audit and it comes back that the staff are not doing all of their clinical notes and this is very serious and She tell the PCO about it (Doc.70 Exhibit H1)

34. December 3, 2025 The PCO text the CEO at 1:53 to ask her if the CEO is able to talk to the counselors about doing individual. She is advocating for two women under investigation for serious harmful allegations. She knows what they are accused of. You will find later that that one of the Staff CW was not doing any individuals before she was put under investigation. (Doc. 70 Timeline 34.25.26.27)

35. December 3, 2025 4:43 pm CEO Texted the PCO about a meeting she has already been told verbally on the phone about. This is concerning the staff not doing their clinical notes, which effects patients care and if you bill for it and it is

not done then you have to pay the money back or it is fraud. The CEO tells them at the meeting that they have to get their notes done right away. The PCO was present via phone (Doc.70 Timeline 39)

36. December 4, 2025 The CEO sees the counselor C.W. that is under investigation talking to a patient alone, which she is not allowed to do at this time. The CEO pulls her aside and tells her during the investigation that she can not have private conversations with patients. She started to threaten the CEO in front of patients and put her hand in the CEO's face and was very aggressive. At that point the CEO could no longer let C. W. on sight during the investigation. A restraining order is granted on December 16th against C. W. (Doc 70 exhibit Y) (Doc. 70 Timeline 40)

37.December 4th 2025 The same day that the CEO is attacked and according to OHFLACS record they are called on December 4, 2025. They do not arrive until December 8, 2025.The CEO did not know this until later that they were called on that date until they showed up on the December 8, 2025. (Doc.70 Timeline 42.)

38. December 5, 2025 Mental Health technician tells the CEO that Counselor C.W. tells her that the treatment team, the Nurse Practitioner and the Ombudsman was on the phone with a women named Lisa. (she is a surveyor for OHFLAC) This shows that the Ombudsman instead of asking questions from the CEO about any concerns was not acting as a disinterested party. (Doc.70 Timeline 47)

39.December 5, 2025 2:10 pm Text message from CEO to PCO. The CEO tells PCO about hearing that she was on a call with the treatment team and that the counselor C. W. is telling them everything. The PCO denies it and says she does not know what they are talking about. (Doc. 70 Timeline 48.)

40.December 8, 2025 10:37 text message. From the PCO to the CEO. She speaks that she heard the CEO fired the MHT supervisor and told C. W. Therapist not to come in. She said this is the second week with no therapist for individual sessions. She knows that she physically threatened the CEO and she is under investigation. The Supervisor was not showing up for work and threatening residents. The CEO had to make decisions to protect residents and instead, the PCO was concerned with staff. (Doc. 70 Timeline 50)

41.December 8, 2025 OHFLAC comes in and the PCO is with them and she tells the CEO it is a coincidence. She is colluding with staff against another staff member and she does not tell them about things that C. W. is under investigation for. This delayed the investigation for the Counselors C.W. and D. J. because now it is all about OHFLAC. OHFLAC states that the CEO had been yelling and screaming at the residents in a meeting, in their efforts to target the CEO, by getting some of C. W. patients to testify. This evidence is refuted at a human rights committee, when residents that were there an on the committee stated that never happened. (Doc.70 exhibit R Timeline 52, 53,54)

42. December 9th, 2025, 8:01 am Text message from PCO to CEO. She says it is her understanding that the one counselor has been doing her notes and can she do therapy. The investigation was not done because they called in OHFLAC, so it was ready to begin. (Doc.70 Timeline 55)

43.December 9, 2025 and unusual fifth report comes in short of it 60 days due date. Time period November 17, through December 9,2026. She reports that OHFLAC was there on December 8, 2025. She states that she came in on **November 26, 2025**. This was the day after the hearing for the CRO. The PCO puts her concerns about the CEO firing 2 Staff and two are under investigation, she states one case manager hired, 6-month program is not being utilized, then she goes into things happening in intake that were not true and unvetted. Again, only unvetted hearsay and nothing was discussed with the CEO to get her side of it. The CEO claims these accusations are not true. What she does not mention in her fifth report is that the case manager said disturbing remarks to the residents and that the investigation showed that she broke in the building and had stolen residents' information with their birthdates on it (which is a HIPAA Violation). The PCO left out the staff not doing their documentation, which had to be corrected by the CEO Documentation effects patient care, (Doc.70 Exhibit H1) (Doc.70 Timeline 55 & 56)

**44.**December 10th the Investigations begins on the two staff members and ends

in December 12th. In the investigation the counselor C. W. was telling patients in groups that the CEO was going to jail or leaving the facility. R. C. stated many residents said it was affecting their treatment. C. R. Stated that she was told in their therapy group that whenever that hearing happens that the CEO was going to be fired and she would be replaced the next day. She stated then the ombudsman would come in and look through any and all information and be a part of revamping the facility. **This is very important because this was told to the staff members by the ombudsman before the hearing on November 25th about the CRO. This was then told to residents. The ombudsman came in the day after the hearing just like the residents reported as stated in her December 9, 2025 fifth report.** C. W. was recommended by the investigation team to be terminated and she was. They recommended D. J not to be fired. There is so much that was said. This shows her bias and colluding with staff against the CEO. (Doc.70 Exhibit A, C & D) (Doc 70Timeline 58)

**45.** December 19, 2025 The magistrate ordered a personal restraining order against counselor C. W. for the protection of the CEO. (Doc.70 Exhibit Y and Timeline 61)

46. 12/23/2024 Order Authorizing employment and retention of William

**47.** December 23, 2025 Order to employee CRO William Frederick. (39)

**48.** December 26, 2025 The ombudsman in reference to an insurance audit that had failed while under the former clinical director and former Compliance officer during their tenure. The PCO sends a letter on behalf of the Debtor to the insurance company under the direction she states of the CRO. She exceeded the scope of her authority (Doc. 70 Exhibit H and Timeline)

49. January 5, 2026 Written notes from our longest employed Mental Health Technician, stating that he has never seen the CEO yell or scream at any resident or been aware of a resident not being able to visit due to a disability. Referring to the states OHFLAC's recent findings. (Doc.70 Exhibit X and timeline 65)

50.January 14, 2026 A workforce Hearing takes place concerning the incident with Case manage M. M. accusations on October 20th 2025. The result was that the employer was found without cause, that the Case Manager testimony was filled with inconsistencies and court found that she had quit the day before. (Doc. 70 exhibit I)

51.January 30, 2026 Quarterly Human Rights Committee / CRO is present and approves of the notes. The CEO was not allowed in the second part of the meeting where Residents on the HRC stated that the CEO never screamed and yelled at patients in a meeting that OHFLAC reported she did. (Doc. 70 Exhibit R and timeline 66)

52. February 1,2026 The utilization nurse sends out an audit and a stern warning to staff about not doing their notes and the possible legal consequences. The CRO and Ombudsman are aware of this and nothing is done. Utilization nurse was told not to do any more audits by the CRO (Doc 70 exhibit B & Timeline 67)

53.January 16, 2026 to set hearing for January 23rd 2026 for expediating hearing. The reason for this hearing was because the CRO had hired a Managing company with a criminal background that was friends with one of the debtors' attorneys. He signed a contract without our the boards written consent as in his contract. The Board had rejected the company in the summer and now the company was brought back in through the CRO. The company's owner had a long list of corporate criminal actions. Serving time in jail. The CRO signed a contract without the board's approval as his contract stated he must. The CRO stated if we did not accept it by the end of the day that he would resign. We accepted his resignation as his email stated. The lawyer and the CRO then reneged on the resignation (Docket 42) (Doc.48 and Exhibit A3 and A 3)

54.January 23, 2026 The expediated hearing takes place. Of course, the CRO, the ombudsman and the Lawyer where negative. because we asked to get a new lawyer, because he was not doing any evidentiary hearing to refute the ombudsman's claims, the lawyer talked the board into bringing a CRO and was not honest about what it entailed. CRO that brought in the managing company who

had the criminal history and were friends of the Debtor's lawyers in his office. It felt like a hostile takeover to the board. (Doc. 87) (Doc. 87 Page 35 16-25 Then pages 36-73)

55.February 9, 2026 This is when the missing 6 report should have been filed at this time. According to the ombudsman's 60-day requirement. Since the last fifth report was shortened and was entered right before the investigation for Counselor D. J. and Counselor C. W... This report would should have included the investigation of the mental abuse cause to a protected class by two counselors and POC being mentioned in the report, how the CEO was attacked by C. W. with witnesses including patients watching, how the patients knew about the hearing for the CRO and that the CEO would be fired prior to the hearing, how the patients were manipulated by the C.W. and D. J. and how the report showed that C.W. was not seeing her patient prior to the investigation, what the counselors were saying in their groups were affecting their treatment, how the Ombudsman was a part of calling OHFLAC on December 4 and not on the staff under investigation, but on the CEO in coordination with the staff under investigation, that had just threatened the CEO. On December 4th as reported by staff.

56.February 18, 2026 Hearing to appoint a Trustee hearing is held and judge

let's the CEO cross examine witness on a surprise. She is not prepared and the judge did not grant an extension of time to get an attorney. Ombudsman again negative unvetted testimony.

57.March 5, 2026 The new Trustee is appointed.

58.March 18, 2026 Text from CEO to Trustee

About the noncompliance at the facility and stating that she needed to find out if the board is responsible for what is going on under their watch. (Doc. 67 page 6)

59.March 20 2026. He comes in mad and tells me to go to the court and tell them whatever she want. Trustee comes in on a Friday he is mad and tells me I am put on leave. (docket 67 page 6)

60.March 27, 2026 PCO Seventh Report from periods from January 30 2026, through March 27 2024. Four days after CEO was put on leave after telling the Trustee that she was concerned for noncompliance and that she was going to the judge to make sure the board was not responsible. She stated after the Trustees appointment issues persisted with intake, including incomplete missing forms. delays in sending assessments. (Doc. 70 Timeline 69 a through j and Timeline70) (Doc. 70 Exhibits U, V, W, and X1)

May1, 2026 Pro se Correspondence concerning building non-compliance and Duty of care facts to the court. 9:45 pm

May 1st 2026 The CEO is terminated that afternoon.

61.May 20, 2026 Motion to Remove or replace Ombudsman. The appellant states that the ombudsman is not acting in the best interest of the patients, has violated her duties under 11 U.S.C.§ 333, has been impartial, acted outside of her scope, breach of confidentiality, Breach of Duty, Misconduct and Bankruptcy Fraud. (The motion also challenges Ombudsman report No. 4,5,7, and 6 missing from the record. Doc. 70)

62.May 22, 2026 -Order to remove or replace ombudsman denied. (Doc. 72)

63. Notice of Appeal from Docket 72. (Doc. 80)

## SUMMARY OF ARGUMENT

The bankruptcy court committed reversible error under de novo review by adjudicating the motion on a materially incomplete record that omitted the mandatory sixth Patient Care Ombudsman (PCO) report. Pursuant to 11 U.S.C. § 333 and Fed. R. Bankr. P. 2015.1, a PCO is statutorily mandated to report at least every 60 days. The whole argument of the appellant was that this was done premeditated, not only for bias purposes, but to cover the investigations, staff and protect her own involvement in wrong doings. Following an abnormally prematurely filed fifth report on December 9, 2025 designed to evade an internal investigation outcome that began on December 10, 2026 then the PCO completely omitted the mandatory sixth report without court permission.

The lower court then failure to Adjudicate the Entire Scope of the Motion to

Remove and Replace the Ombudsman Ignoring the replace and focusing on that the ombudsman was needed. Which the appellant agrees a new ombudsman is needed. (Doc.70 & Doc. 72)

The lower Court commits an error of law when stating that the ombudsman is a neutral and disinterested party, and failed to address the correct legal standard. The ombudsman colluded with certain staff against the CEO, holding private meetings with staff members against the staff member, isolating the party. Bias in facts and recommendations that consistently favored certain persons over the others. Listening to disruptive employees created a high-risk situation that severely damages the reorganization process. Misleading the court and the U.S. Trustee based on skewered and malicious fabricated information. The PCO leaked information to the employees about the removal of the CEO that she had put in her objection to the request of an extension and her request for the CRO on Nove. 10 2026. This was prior to the hearing that took Place on November 25th 2026. This information was then shared with the patients during clinical group setting prior to the hearing and the CEO found out about it after the hearing took placed. The staff member that was under investigation told patients before the hearing that the CEO would be fired and the ombudsman would come in to see what needed fixed. Like she told the staff she came in the next day after the hearing on the 26 of November. Then after the CEO was threatened bodily harm by a therapist under investigation,

the ombudsman is a part of calling in OHFLAC, along with that staff member to protect the staff member from getting fired and protecting herself from the investigation's findings report. This caused Chaos on the ground for the residents she was supposed to protect. Completely omitting her 6th report that should have reflected how the two counselors' actions took a mental toll on the patients, how it affected their treatment and covering her own participation of harm that was caused to the patients. Also, the patient documentation that the staff were not completing their notes. The PCO then does her fifth report. Blames the debtor for the Chaos that PCO and the two employees were causing that effected the patients. Continues to report that the staff are doing the best they can and not reporting on the mental abuse by the two counselors or the staff not doing their clinical notes of the patients care. The CEO was trying to fix the problem, but the ombudsman was empowering the bad actors. The Court committed an error by misinterpreting and fundamentally misapplying the Congressional intent behind the POC provisions of the Bankruptcy Abuse Prevention and Consumer Protection Act. The Court stated in its denial of the motion that a patient care ombudsman has discretion on what matters are relevant and necessary to report to the court, which essentially shields the POC from Mandatory reporting; refer to 11U.S.C section 333. Then once the CRO comes in and then the Trustee she then writes false reports leaving out abuse allegations and continues to write false reports about the untrue unvetted

information about the CEO part in the intake. Relying on the nurse practitioner who was providing false information as CEO shows in her motion. The Ombudsman caused a toxic environment where she was weaponized. This effected the reorganization, because the CEO lost control of the staff. She then presented to the court and they were accepted by the court and the trustee as fact. The judge erred in law under the Federal Rule of Evidence 801(c) using the Ombudsman's uncross-examined reports to make major decisions (Making false allegations that led to the loss of her standing as the debtor) that were based mostly on hearsay. On June 16, 2025, the Debtor filed its Motion to Extend Exclusivity Period for the Confirmation of a Plan of Reorganization Pursuant to 11 USC Section 1121(d). On November 10, 2025 the Ombudsman objects to the extension in direct violation of her statutory mandate under 11U.S.C. section 333 to focus exclusively on patient care and welfare. The PCO improperly utilized her position to micro-manage executive staffing and advance internal staff preferences. This bad -faith objection manufactured artificial leverage, panicking counsel into pressuring the board to accept the CRO contract and triggering the destructive cascade that led to the appointment of the trustee. The ombudsman failed to report on real abuse and the CEO had to stand back and watch and could not change anything because she was not in charge. (Doc. 70)

## ARGUMENT

**I. The Bankruptcy Court Committed Reversible Error Under Denova Review by Adjudicating the Motion on an Incomplete Record That Omitted the Missing Sixth Report. The Court Failed to Address or Make Findings of Fact on the Core Allegations of Bad Faith Concealment. Rendering Its Ruling on This issue Legally Defective Under 11 U.S.C. § 333.**

**A. Standard of Review:** In an appeal from a bankruptcy court order, the district court exercises **de novo review** over 1 bankruptcy court's legal procedural due process, and whether an adjudication was made on an incomplete record. A bankruptcy court's failure to address mandatory statutory reporting requirements and its complete omission of material record evidence constitute reversible errors of law reviewed without deference. Furthermore, factual findings are reviewed for clear error *under Federal Rule of Bankruptcy Procedure 8013 (Anderson v. City of Bessemer City, 470 U.S. 564, 573–74 (1985))*, and a court abuses its discretion when it fails to establish a rational connection between the documented facts of record and its legal conclusions.

**B. De Novo Review:** The Bankruptcy Court Committed a Due Process Violation by Adjudicating the Motion on an Incomplete Record and Remaining Completely Silent on the Missing Sixth Report Under 11 U.S.C. § 333 and Fed. R. Bankr. P. 2015.1, a Patient Care Ombudsman (PCO) is a court-appointed officer

statutorily mandated to report to the court at least every 60 days, as the judge states in his order. This is a core statutory requirement of the Bankruptcy Code designed to guarantee continuous judicial oversight, transparency, and the protection of patient welfare. (Doc. 72)

1. **Judicial Silence on the Statutory Default:** The official **Complete** chronological record established that following an abnormal, truncated fifth report filed prematurely on December 9, 2025, the PCO **completely omitted and skipped her mandatory sixth report** without any court-ordered extension or permission. Despite Appellant placing this undisputed default squarely before the court, the bankruptcy court's order was entirely silent on the missing report. The judge acknowledged the general 60-day rule in the abstract but failed to mention, address, or reconcile the missing sixth report. (Doc. 72)

2. **Adjudication on an Incomplete Record (De Novo Error):** The lower court adjudicated a matter on a materially incomplete record in violation of procedural due process is a question of law reviewed **de novo**. By sweeping the missing sixth report under the rug and leaving the statutory default unaddressed, the bankruptcy court committed a fundamental due process violation, rendering its decision on a skewed, incomplete record and insulating a court-appointed fiduciary from statutory accountability.

**C. Reversible Error: Failure to Make Findings of Fact Regarding**

**Core Allegations of Bad Faith, Concealment, and Reporting Manipulation**:

When a motion for removal squarely places bad faith, reporting manipulation, and fiduciary breach before a court, the judge has a mandatory legal obligation to make findings of fact addressing those core allegations. The bankruptcy court completely failed to make any findings of fact regarding these core allegations of bad faith and intentional concealment. A trial court abuses its discretion and commits clear error when it ignores central claims of fiduciary misconduct while omitting any analysis of missing statutory filings.

1. **Core Allegations Ignored:** Appellant's motion and supporting record established that the PCO purposely remitted and truncated her reports—filing prematurely on December 9 to evade the fallout of an internal investigation finalized on December 10 regarding disciplined staff—as part of a bad-faith effort to conceal her structural bias and reliance on non-credible, compromised sources.

2. **The PCO Exceeded Her Statutory Authority and Acted in Bad Faith to Protect an Employee Under Investigation:**

Under 11 U.S.C. § 333, a PCO is appointed strictly to monitor the quality of patient care, not to usurp management functions or interfere in internal human resources matters. Here, the PCO abandoned her role as an impartial court-appointed monitor:

3. **Premature Disclosure/Breach of Confidentiality:** PCO told

employees prior to the November 23th, 2025 hearing that the CEO was going to be fired and she was coming in to fix things.(Doc.70 timeline 58 & exhibits A,C & D)

4. **Unauthorized Interference:** The Employee related this to patients about the CEO of the company. This upset the residents in their treatment. The employee was put under investigation for saying many disturbing things to the patients. She was found guilty and was terminated. The PCO was told by the CEO of the disturbing things she was saying.

5. **Retaliatory Coordination/ Abandoning internal Deescalation and Neutrality:** After the Employee physically threatened the CEO, the employee falsely claimed to the PCO that she was the one threatened. Rather than maintaining neutrality, the PCO secretly coordinated with this employee and staff to report the CEO to OHFLAC without informing the CEO, without doing an internal investigation, without questioning the CEO. actively manipulating state regulatory mechanisms to shield an insubordinate employee from termination. She showed up and sat in with the OHFLAC and stated it was a coincidence. (Doc. 70 Timeline 47 exhibit Y timeline 40, Timeline 48, Timeline 50, Timeline 52,53, 54)

**D. The PCO Manipulated Filing Timelines and Intentionally Suppressed the Sixth Report to Conceal Her Own Misconduct.**

1. **The PCO's unauthorized interference and collusion**

**provide the direct motive for her bad-faith manipulation of the court's reporting record:**

**a). Preemptive 5th Report:** Knowing the internal investigation into the employee began on the 10th, the PCO prematurely filed her 5th report on the 9th—just one month after her 4th report—to get ahead of the investigation findings.

**b). Total Omission of the 6th Report:** The PCO then completely abandoned her statutory reporting duties by omitting the mandatory 6th report altogether. Complying with her 60-day requirement under 11U.S C§ 333(b)(2) would have forced her to file patient and staff accounts exposing her improper involvement, conflict of interest, and ultra vires actions.

**c). Missing Documentation:** Missing Individual Counseling was Reported by the CEO and she was fixing it. It was also reported residents were not being seen by the counselors and not doing there notes and this was not reported.

**E. De Novo Review: Absence of a Rational Connection Between Facts and Choices, and the Failure to Evaluate Statutory Cause for Removal Under 11 U.S.C. § 333:** A judicial decision must rest upon a rational connection between the established facts of record and the ultimate legal conclusion reached. Here, that connection was entirely absent. *Federal Rule of Civil Procedure 52(a)*

*(applicable via Fed. R. Bankr. P. 7052 and 9014)* requires the court to find facts specially and state conclusions of law separately.

**1. Despite Appellant raising these core threshold issues, the court made zero findings regarding:**

a). Whether the PCO's premature 5th report and total omission of the 6th report constituted a bad-faith scheme to conceal material evidence;

b). Whether failing to file the required report violated 11 U.S.C. § 333(b)(2) and breached the PCO's court-appointed fiduciary duties; and

c). Whether sufficient cause existed under the law to remove the PCO for nonfeasance, self-interest, and breach of statutory obligations.

**2. Failure to Evaluate Statutory "Cause" for Removal:**

Under **de novo** review of the statutory framework of **11 U.S.C. § 333**, a court-appointed ombudsman who breaches the core 60-day reporting mandate, conceals missing paperwork, and abandons neutrality to protect compromised staff has breached her fiduciary duties as a matter of law, establishing mandatory "cause" for removal. Because the court omitted critical, material evidence from its analysis and ignored the PCO's deliberate breach of her fiduciary duties, its decision failed

to establish a rational connection between the facts and choices made, rendering the ruling arbitrary, capricious, and grounded in error of law.

**3. Improper Mischaracterization as "Employee Grievances":** To avoid addressing the PCO's clear violation of § 333 and the missing sixth report, the bankruptcy court dismissed Appellant's comprehensive documentation as "generalized employee grievances." This was a fatal legal mischaracterization subject to **de novo** review. A calculated failure to file mandatory 60-day reports—timed specifically to evade investigation findings and cover up a total breakdown in statutory reporting—is not a workplace disagreement; it is a direct breach of statutory duties and court-appointed fiduciary obligations under the Bankruptcy Code. Because the decision was rendered on an incomplete record without the requisite findings of fact on bad faith, the order must be reversed.

## II. The Bankruptcy Court Committed Reversible Error and Abused Its Discretion by Failing to Adjudicate the Entire Motion to Remove and Replace the Ombudsman.

**A. Standard of Review:** We review a lower court's complete failure to address a properly raised, substantive claim or form of relief **de novo**. *See United States v. Moussaoui*, 382 F.3d 245, 297 (4th Cir. 2004) (holding that whether a court failed to consider or adjudicate an alternative form of relief properly presented in a motion involves legal and procedural integrity subject to plenary

review). To the extent the decision calls for evaluating the underlying management or supervision of a fiduciary, it is reviewed for an **abuse of discretion**, but a court inherently abuses its discretion as a matter of law when it premises its ruling on a complete mischaracterization or wholesale omission of a properly submitted alternative request for relief. (Doc. 72)

**B. The Bankruptcy Court Abused Its Discretion by Mischaracterizing the Motion and Relinquishing Its Duty to Rule on the Entire Record.**

1. The Appellant's motion sought distinct, paired forms of relief: both the removal of the incumbent ombudsman and her immediate replacement with a qualified alternative based on specific performance and reporting failures.

2. Rather than evaluating the motion on its full merits, the Bankruptcy Court committed a procedural error by framing the issue narrowly around the general statutory requirement for an ombudsman and 60-day reports, effectively creating a "straw man" argument that assumed any challenge to the current individual was a binary attempt to eliminate all patient oversight.

3. Under established federal standards of review, a court abuse its discretion when it acts arbitrarily, relies on erroneous factual or legal premises, or fails to consider properly raised components of a motion, as affirmed by the United States Supreme Court in Cooter & Gell v. Hartmarx Corp., 496 U.S. 384,

405 (1990), and the Fourth Circuit in United States v. Dillard, 891 F.3d 151, 158 (4th Cir. 2018).

### C. The Court's Failure to Adjudicate the Replacement Component Constituted an Incomplete Ruling and a Denial of Due Process

1. Fundamental principles of procedural due process guarantee litigants a fair hearing and a reasoned decision addressing all material issues, arguments, and forms of relief properly placed before the tribunal. By completely bypassing the substantive legal arguments and factual record regarding the necessity of a replacement, the court left a critical portion of the motion unaddressed and unresolved, rendering the adjudication incomplete, one-sided, and prejudicial to the Appellant.

### D. Conflating the Role with the Individual Resulted in a Structural Miscarriage of Justice.

A judicial ruling that resolves only a fraction of a motion while ignoring the remaining substantive prayers for relief cannot stand. The court's logic—that the PCO could not be replaced because a PCO is needed—is inherently flawed. It insulated a fiduciary from accountability simply because her job title is required by statute. Because the bankruptcy court failed to exercise independent legal judgment on the entire scope of the motion before it, the partial ruling cannot stand as a valid adjudication on the merits and requires vacatur and remand.

**E. The Court Abused Its Discretion by Failing to Exercise Its Statutory Authority to Appoint a Qualified Successor.**

A court abuses its discretion when it fails to exercise its discretion altogether or completely ignores a substantial, properly raised legal argument. Under 11 U.S.C. § 333, the court possesses ongoing supervisory authority to evaluate whether an appointed PCO is effectively serving the estate or whether a replacement is necessary to restore integrity to the process. By turning a blind eye to the replacement aspect of the motion, the court failed to engage in the necessary statutory analysis. Replacing a compromised PCO satisfies both needs: it keeps the statutory ombudsman function intact for the court while removing an individual who breached her fiduciary duties. The court made zero findings of fact or conclusions of law regarding:

1. Whether replacing the current PCO for cause would satisfy the court's need for an ombudsman while curing the ongoing conflicts of interest;
2. Whether a neutral replacement was required to restore credible patient advocacy and statutory reporting under 11 U.S.C. § 333(b)(2); and
3. Whether leaving a compromised individual in a fiduciary position harmed the integrity of the bankruptcy proceedings.

Leaving a substantive, standalone request for replacement completely unresolved is a threshold legal error that prevents full appellate review and requires a remand.

**III. The Bankruptcy Court Committed Reversable Error of Law By Misinterpreting and Misapplying 11 U.S.C. § 333, Erroneously Holding That a Patient Care Ombudsman Possesses Discretion Over What to Report and Thereby Improperly Shielding the PCO From Mandatory Reporting Laws; Ignoring Evidence of Unreported Abuse Designed to Conceal Misconduct; and Failing to Consider the Facts Presented in The Motion Without Evaluating Whether the Substantive Elements of The Claim Were Met.**

**A. Standard Of Review:** A district court reviews a bankruptcy court's conclusion of law and questions of statutory interpretation-such as the legal scope and requirements of 11 U.S.C§ 333-de novo. See In re Southeast Hotel Properties Ltd. Partnership,99 F.3d 151,154(4rth Cir. 1996). Underlying findings of fact and assessment of evidentiary record are reviewed for clear error pursuant to federal Rule of Bankruptcy Procedure 8013, while the ultimate denial of the motion is reviewed for an abuse of discretion. A court commits an abuse of discretion when it relies on erroneous legal premises or ignores unrefuted evidence properly placed before it. *See Cooter & Gell v. Hartmarx Corp, 496 U.S.384, 405(1990).*

**B. Factual Background and Record Below:**

1. The record before the bankruptcy court established a clear

pattern of systemic patient abuse, employee misconduct, and active suppression of complaints by facility management—none of which were captured or reported by the Patient Care Ombudsman pursuant to 11 U.S.C. § 333.

2. The bankruptcy court and the PCO attempted to dismiss the evidence by falsely claiming the Appellant had been absent from the facility for a prolonged period, whereas the PCO's report covering the two-month period ending March 30 directly overlapped with the Appellant's active tenure, as the Appellant went on leave on March 20,2026 and was terminated on May 1, 2026 thus possessing contemporaneous, first-hand knowledge of facility operations during the critical reporting window.

3. The Appellant presented the bankruptcy court with a comprehensive, detailed log of multiple instances of patient mistreatment and abuse during this period of time that went entirely uninvestigated and unreported by the PCO, including direct communications and testimonies from patient parents who called the Appellant in distress to report active mistreatment. (Doc. 70 Page 52, timeline 70-Doc. 70-page 48 timeline 69- Doc. 67 Page 2 – 33, Doc. 70 exhibit A, C D Doc 70 Timeline 58- Doc 70 Exhibit L,G,I and C1)

4. Rather than investigating reports of abuse, facility management routinely suppressed complaints by unlawfully discharging or expelling victimized patients to cover up employee misconduct, leaving an extensive and unrefuted

record of active patient harm that the PCO omitted from its court-mandated reports.

5. The Appellant had information provided to the court that not only was information provided of abuse to the ombudsman during that period, but that other girls made complaints and nothing was done or reported. The resident was sent back to jail like others that had complained.

6. The PCO purposefully avoided filing or completing her sixth report to intentionally suppress active allegations of patient harm, deliberately shielding employee misconduct and concealing the PCO's own involvement and failure to address these critical violations.

C. **Argument and Legal Analysis**

1.The bankruptcy court committed a fundamental error of law when it denied the Appellant's motion by holding that a PCO has absolute discretion regarding what matters are relevant and necessary to report, which directly violates the statutory design and congressional intent of *the Bankruptcy Abuse Prevention and Consumer Protection Act.*

2. The bankruptcy court committed a severe error of law by concluding that PCO discretion permits the omission of abuse, thereby improperly shielding the PCO from mandatory reporting laws; the court failed to recognize that applicable state and federal mandatory reporting laws—alongside the core

safety mandates of 11 U.S.C. § 333—impose an absolute legal duty with zero choice, meaning a PCO has no legal choice or discretion to shield employee misconduct, conceal active allegations of harm, or evade these duties by intentionally withholding required reports to cover up complicity.

3. The bankruptcy court abused its discretion and committed procedural error by entirely ignoring the unrefuted factual evidence and testimony presented in the Appellant's motion, relying upon an improper legal conclusion regarding PCO discretion, and entering judgment without ever evaluating whether the substantive elements of the claim were met.

**IV. The Bankruptcy Court Erred as a Matter of Law Under Federal Rule of Evidence 801 and Violated Due Process by Relying on the Uncross-Examined, Biased, and Hearsay-Laden Reports of the Ombudsman to Make Major Case Decisions, Including the Removal of the Debtor/Founder.**

**A. Standard Of review**: Constitutional claims and Questions of procedural due process- including the right to a fair hearing, confrontation, and cross examination – are questions of law reviewed *de novo*. *See Price v. Lehtinen 564 F.3d 1052(9th Cir. 2009)*. A bankruptcy court's decisions regarding the admissions of evidence, handling of hearsay, and evidentiary reliability are reviewed for an abuse of discretion. See In re *Latman v. Burdette,366 F.3d 774(9th*

*Cir. 2002)*. An abuse of discretion occurs when a court relies on hearsay or biased, extra -record reports to the prejudice of a party's substantial rights.

B. **The Bankruptcy Court Erred as a Matter of Law Under Federal Rule of Evidence 801 by Admitting and Relying Upon Inadmissible Hearsay to Drive Major Judicial Decisions.**

1. Under Federal Rule of Evidence 801 and 802, the Ombudsmen uncross-examined reports constituted inadmissible hearsay, comprising out-of-court statements offered to prove the truth of the matters asserted without any foundational evidentiary vetting.

2. The Bankruptcy Court committed reversible error by elevating these unsworn, unverified reports to the level of substantive evidence, improperly using them to make major, case-altering decisions, specifically facilitating the removal of the founder and stripping the debtor of her standing. Under Fourth Circuit precedent, a bankruptcy court's legal conclusions and misapplication of evidentiary standards are subject to *de novo* review. See Stancill v. Hartford Sands Inc. 372 F.3rd 637, 639(4th Cir.2004)..

**C. Court Violated Fundamental Due Process Rights by Denying the Debtor a Meaningful Opportunity to Confront Adverse Evidence and Utilize Cross-Examination.**

1. Under bedrock United States Supreme Court jurisprudence,

"[i]n almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses" (*Goldberg v. Kelly*, 397 U.S. 254, 269 (1970)). Furthermore, where judicial or administrative action seriously injures an individual's standing or livelihood based on disputed facts, the evidence must be fully disclosed and subjected to cross-examination to test for malice, vindictiveness, or prejudice (*Greene v. McElroy*, 360 U.S. 474, 496–97 (1959)).

2. The Bankruptcy Court manufactured an illusory semblance of due process during the critical proceedings leading to the trustee's appointment by ambushing the unrepresented founder—whose counsel had abandoned her interests and refused requests for a continuance—forcing her to respond without preparation, and then falsely characterizing this procedural trap as a valid opportunity to defend against unvetted allegations. Administrative reports, regardless of the statutory discretion granted under 11 U.S.C. Section 333, cannot bypass constitutional due process protections or be shielded from standard evidentiary scrutiny when a party is denied any true, prepared mechanism for cross-examination or defense against hostile parties.

### F. The Ombudsman Overstepped Her Statutory Role, Exhibited Proven Retaliatory Bias, and Acted as a Biased Shadow Decision Maker Following the October 28, 2025 Facility Incident.

1. The ombudsman's sudden posture shift is entirely contradicted by the objective record; her comprehensive report filed on September 17, 2025, covering July 15, 2025, through September 17, 2025, confirmed that Serenity Hills Life Center was operating in full compliance and that all operations were running properly.

2. The procedural timeline demonstrates that the ombudsman's hostility materialized only in response to a major security incident on October 28, 2025, where an unauthorized former employee breached the facility, destroyed property, and stole documents containing patient-identifying names—an individual whose accusations were subsequently dismantled and found entirely uncredible in a formal workforce proceeding where the debtor was cleared of wrongdoing.

3.Rather than maintaining neutrality under 11 U.S.C. Section 333, the ombudsman abandoned her statutory mandate following this incident, filing an untimely objection to an  the motion for an extension on November 10, 2025, well past the court's October 28 deadline regarding the debtors' October 27 motion to extend the exclusive filing period.

3. Acting as a biased shadow decision-maker during the November 25, 2025 audio conference hearing, the ombudsman improperly advocated for the ouster of the CEO by weaponizing a threatened employee resignation from employee who sought to remove the founder, while

manufacturing false claims that the debtor was holding people back in treatment, committing fabricated HIPAA violations, and falsely mischaracterizing facility governance.

4. The Bankruptcy Court committed a clear abuse of discretion and reversible error under Fourth Circuit standards by adopting these partisan, unvetted hearsay allegations and dismissing documented evidence of extreme bias and procedural abuse as mere generalized employee grievances *See Stancill v. Hartford Sands Inc. 372 F.3rd 637, 639(4th Cir.2004)..*

**G. The Bankruptcy Court Committed Reversable Error And Abused Its Discretion by Completely Ignoring Specific Evidentiary Challenged Raised in the Motion Against Fourth, Fifth, Missing Sixth, and Seventh Reports.**

1. The debtor's original motion squarely challenged the substantive validity, omissions, and procedural defects of specific administrative fillings, including the fourth report, the fifth report, the conspicuously missing sixth report, and the seventh report. It also challenged the November

2. The bankruptcy Court committed an abuse of discretion and procedural error by entering and order that completely failed to address, evaluate, or adjudicate these specific, documented evidentiary challenges raised by the debtor.

3. Under Fourth Circuit standards, a court's wholesale omission of material arguments and documented challenges to core evidence prevents meaningful appellate review and constitutes an arbitrary abuse of discretion requiring reversal and vacatur of the order.

**V. The Bankruptcy Court Committed Reversible Error by Declaring the Patient Care Ombudsman a "Neutral and Disinterested" Officer as a Matter of Law, While Ignoring a Detailed Evidentiary Timeline and Documented Proof of Bias and Misconduct.**

**A. Standard of Review:** A bankruptcy courts legal conclusions, statutory interpretations, and determinations regarding whether an officer qualifies as a neutral and disinterested as a matter are reviewed de novo. *See In re Southeast Hotel Properties Ltd.,99 F,3d 151, 154(4th Cir. 1996).* Under de Nova review, the district court affords zero deference to the lower court's legal ruling. The bankruptcy court's underlying factual findings and handling of the evidentiary record establishes bias and misconduct are reviewed for clear error under federal Rule of Bankruptcy Procedure 8013. United States v. Dillard, 891 F.3d 151, 158 (4th Cir. 2018)

**B. The Statutory Mandate of Neutrality and the Error of Invoking "Disinterestedness" in an Evidentiary Vacuum.**

1. Under 11 U.S.C. § 333(a)(2)(A), the United States Trustee is explicitly required to appoint a **"disinterested person"** to serve as a Patient Care Ombudsman (PCO) to monitor patient care and represent patient interests.

The requirement of disinterestedness and neutrality is not a hollow formality; it is a foundational prerequisite designed to ensure that court-appointed officers act without personal bias, ulterior motives, or hidden conflicts of interest. As courts have long recognized in the context of court-appointed fiduciaries and professionals, the statutory demand for disinterestedness requires active protection against compromised loyalties. *Cf. In re Martin, 817 F.2d 175, 180 (1st Cir. 1987)* (emphasizing that statutory disinterestedness provisions guard the integrity of the bankruptcy process against material adverse interests or partiality).

In its order, however, the bankruptcy court summarily glossed over this standard, declaring the PCO a "neutral and disinterested officer" as an unassailable conclusion. By treating "neutrality" as an absolute legal shield, the lower court relieved the PCO of her statutory obligations under Section 333 and failed to apply the proper legal standard when confronted with direct proof of bias.

**C. The Court Failed to Apply Facts to the Record, Disregarding a Comprehensive Timeline and Documented Evidence of Bias.**

1.The bankruptcy court attempted to bypass Appellant's

evidence by characterizing it as "generalized employee grievances" and subjective "disagreements with the substance or conclusions of the ombudsman reports." This characterization is flatly contradicted by the record. Appellant submitted a comprehensive, evidence-backed report accompanied by a detailed, time-stamped timeline, corroborated by primary source material—including text messages, emails, and direct documentation. Under settled law, a court cannot disregard clear, uncontroverted documentary evidence in favor of bare labels. Specifically, the bankruptcy court's order ignored concrete evidence of bias abandoned oversight.

2. **Colluded with Conflicted Regulatory Actors to Fabricate Interventions:**

The PCO abandoned objective oversight by coordinating behind the scenes with external state regulatory agents (OHFLAC)—including individuals named in active Lawsuit that debtor had an active litigation against —to orchestrate state interventions. The PCO collaborated on phone calls to bring regulators in alongside the employee who was under active investigation for severe misconduct, later sitting in on regulatory interviews under the false pretense of being there "by coincidence." (Doc. 70 Timeline 47, 52, 53, 54 and Exhibit R)

3. **Actively Covered Up Staff Misconduct While Weaponizing False Allegations:** Rather than impartially monitoring patient care or reporting genuine staff abuse, the PCO intentionally concealed the severe

wrongdoing of the employees under investigation. Simultaneously, she amplified and weaponized false, fabricated allegations against facility leadership fed by those same compromised employees.

4. **Breached Confidentiality and Leaked Restructuring Plans:** The PCO stepped entirely outside her role as an objective monitor to engage in administrative sabotage, leaking confidential information—such as the impending arrival of a Chief Restructuring Officer (CRO) before the hearing and planned leadership changes—to staff members under investigation. (It was related by the staff under investigation that the CEO would be fired, and this was related to patients in a clinical treatment group setting.) . (Doc.70 Exhibit A, C & D) (Doc 70Timeline 58)

5. **Bypassed Internal Protocols for Bad-Faith Targeting:** The PCO abandoned objective oversight by bypassing internal facility protocols and investigations, choosing instead to align with rogue staff and external adversaries to undermine administration rather than protecting vulnerable residents. (Doc.70 Exhibit H1) (Doc.70 Timeline 55 & 56) (Missing 6 Report)

6. **Fundamentally Compromised Statutory Neutrality:** By acting as a partisan participant in tandem with conflicted state actors rather than a neutral, independent observer, the PCO violated the core statutory purpose

of her appointment, rendering the lower court's finding of "disinterestedness" legally and factually insupportable.

**D. The Court Erred by Allowing the PCO to Exceed Her Neutral Statutory Role and Act as an Unvetted Shadow Decision-Maker.**

1. *Under 11 U.S.C. § 333*, a Patient Care Ombudsman is appointed as a neutral, objective investigator meant to monitor patient welfare—not as an advocate or judicial proxy.

2. The record demonstrates that the court allowed the PCO to overstep her statutory boundaries, abandoning her neutral mandate to actively push for specific personnel changes and advocate against Appellant. By according conclusive evidentiary weight to the opinions of an ombudsman who exceeded her statutory authority, the court improperly delegated its fact-finding duty to an unvetted, interested non-party.

**E. Conclusion**

A judicial finding of "disinterestedness" cannot stand when it is rendered in total disregard of a comprehensive, time-stamped factual record. By rubber-stamping the PCO's reports and dismissing substantiated evidence of severe bias, regulatory collusion, and concealed misconduct as mere "disagreements," the bankruptcy court committed an error of law and abused its discretion under Cooter & Gell.

This Court should vacate the lower court's finding regarding the PCO's neutrality and remand the matter for a proper, fact-based adjudication

**VI. Whether the Bankruptcy Court Abused Its Discretion by Failing to Review Documented Evidence of Patient Abuse, Mischaracterizing Substantive PCO Misconduct as "Employee Grievances," and Permitting a Falsified Ombudsman Report to Mislead the Court**

**Summary of Argument**

The bankruptcy court committed a clear abuse of discretion when it summarily dismissed Appellant's motion to remove and replace the Patient Care Ombudsman (PCO). Rather than evaluating the extensive, 101-page record—which included a detailed timeline, objective evidence of patient abuse, and joinders from patients and their families—the lower court dismissed these severe safety violations as "generalized employee grievances" and mere "disagreements with the substance of the report."

While a PCO enjoys discretion in monitoring facility conditions under 11 U.S.C. § 333, that discretion does not shield a PCO who actively falsifies reports, conceals documented patient abuse, and misleads the court to protect preferred management or cover up administrative failures. By refusing to review or address this critical evidence of statutory non-performance and bias, the bankruptcy court failed in its primary duty to protect vulnerable patients.

**A. Standard of Review**

A bankruptcy court's decision regarding the appointment, retention, or removal of a Patient Care Ombudsman is reviewed for an **abuse of discretion**. Under Supreme Court precedent, an abuse of discretion occurs when a lower court's ruling rests on a mistake of law or a **clearly erroneous assessment of the evidence**. *See Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 405 (1990); Highmark Inc. v. Allcare Health Mgmt. Sys., Inc., 572 U.S. 559, 563 n.2 (2014).* Furthermore, a factual finding is clearly erroneous when the reviewing court is left with the "definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948).* An appellate court must reverse where the lower court completely fails to consider relevant, material factual submissions or relies on findings flatly contradicted by the record.

**B. The Lower Court Erroneously Mischaracterized Documented Patient Abuse and PCO Misconduct as "Employee Grievances"**

In its order of denial, the bankruptcy court attempted to insulate the PCO's actions by stating:

"The bulk of the motion consists of generalized employee grievances and allegations arising from broader disputes discerning administration of the estate rather than allegations demonstrating failure of the ombudsman to perform statutory duties..."

This conclusion is flatly contradicted by the record:

1. **Direct, Firsthand Knowledge of the Reporting Period:** The PCO's seventh report covered a 60-day window starting in January 30,2026 ending March 27, 2026. Because Appellant was actively on-site and working for the vast majority of that period (until being placed on leave on March 20, 2026), Appellant possessed direct, contemporaneous, firsthand knowledge of the severe, uninvestigated patient abuse and compliance failures that the PCO chose to sweep under the rug. When the CEO stated she was going to report it to the court. She was put on leave two days afterwards.
2. **Concealment of Actual Abuse:** Appellant's motion was not a vehicle for personal employment disputes; it was built upon a rigorous 101-page evidentiary record documenting real safety violations that directly contradicted the PCO's fabricated narrative of institutional improvement under the new administration. It included a Time line with corroborating exhibits.
3. **Patient and Family Joinders:** The motion included direct testimony and joinders from families (such as reports concerning patients) detailing ongoing abuse during this exact timeline—all of which the PCO omitted or falsely minimized to protect preferred personnel.

4. **Breach of Statutory Duty under 11 U.S.C. § 333:** A PCO's mandate is to protect patients, not to act as a public relations agent for a newly appointed trustee or a favored nurse practitioner. Falsifying a report to manufacture a false picture of success while actual abuse goes uninvestigated is a direct abdication of statutory obligations.

**C. Discretion Under Section 333 Does Not Include the Right to File Fraudulent or Misleading Reports**

The bankruptcy court correctly noted that the PCO has discretion on what matters are relevant to report to the court, and that parties cannot remove a PCO merely because they disagree with a report's conclusions. However, the lower court committed legal error by treating fraudulent falsification and the cover-up of abuse as a mere "disagreement over conclusions."

1. **Discretion vs. Fabrication:** Discretion allows a PCO to prioritize certain observations; it does not grant license to fabricate conditions, ignore documented safety threats, or mislead the court regarding the true welfare of vulnerable patients.

2. **Failure to Review the Evidence:** The record demonstrates that the lower court ignored the specific timeline and firsthand evidence provided by Appellant establishing that conditions deteriorated under the new administration, and that the PCO deliberately ignored these facts to protect

her associates. By failing to examine this evidence, the bankruptcy court rendered an unsupportable ruling that fails under established abuse-of-discretion standards.

**D. Conclusion**

The bankruptcy court abused its discretion by refusing to review the substantive, documented evidence of patient abuse and PCO falsification, improperly dismissing severe safety violations as mere employment grievances. Because the PCO fundamentally failed to perform her statutory duties under *11 U.S.C. § 333* and actively misled the court regarding a reporting period where Appellant had separated from the facility, the ruling is legally and factually defective and must be reversed.

If you're ready to continue mapping out your brief, let me know:

**VII.The Bankruptcy Court Committed Clear Error Under Rule 8013 by Basing Its Factual Findings on an Objectively False Timeline and Falsely Disregarding Appellant's Contemporaneous, On-Site Presence During the Ombudsman's Reporting Period.**

**A. Standard of Review:** A bankruptcy court's findings of fact are reviewed for clear error under *Federal Rule of Bankruptcy Procedure 8013*. A factual finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm

conviction that a mistake has been committed. Where a lower court's ruling rests upon a demonstrably false premise or a clear misapprehension of the chronological record regarding a party's presence and capacity to observe contested events, that factual finding cannot stand.

**B. The Bankruptcy Court Committed Clear Factual Error by Falsely Claiming Appellant Was Absent or Uninformed During the Ombudsman's Reporting Period.**

1. In its written order, the bankruptcy court attempted to dismiss Appellant substantive evidentiary submissions by asserting a false chronological premise: that Appellant was not around or present to witness the operational realities, safety concerns, and patient care failures reported upon by the Patient Care Ombudsman (PCO).

2. This judicial assertion is flatly contradicted by the undisputed chronological record. The PCO's seventh administrative report covered a 60-day evaluation window extending up to March 27, 2026.

3. The record incontrovertibly establishes that Appellant Travis was actively on-site, employed, and discharging her duties for the vast majority of that exact 60-day period—only being placed on administrative leave on March 24, 2026, a mere three days before the close of the PCO's reporting window, and subsequently terminated on May 1, 2026.

4. Consequently, the lower court's foundational factual premise—that Appellant lacked contemporaneous, firsthand presence or capacity to observe the conditions during the relevant timeframe—is a clear error of fact. Appellant possessed direct, day-to-day, on-the-ground knowledge of the facility conditions, uninvestigated incidents, and PCO omissions throughout the core of the reporting period.

# CONCLUSION

*CONCLUSION AND PRAYER FOR RELIEF*

*For all the foregoing reasons, the bankruptcy court's order is legally and factually defective. It rests upon an incomplete record, ignored core allegations of bad faith, misapplied 11 U.S.C. § 333, and relied on a clearly erroneous timeline that falsely disregarded Appellant's active on-site presence. To protect statutory integrity, ensure due process, and remedy profound fiduciary misconduct, this Court must intervene. Accordingly, Appellant respectfully requests that this District Court enter an order:*

- **A. REVERSING** *the Bankruptcy Court's Order denying Appellant's motion to remove and replace the Patient Care Ombudsman;*
- **B. VACATING** *the Bankruptcy Court's clearly erroneous factual findings, misapplication of law, and reliance on an incomplete record and false timeline;*
- **C. DIRECTING** *the immediate removal of the current Patient Care Ombudsman due to documented bad faith, statutory defaults, and breach of fiduciary neutrality;*
- **D. REMANDING** *this matter with strict instructions to conduct a full evidentiary hearing concerning the concerning Report 4 through 7 PCO's omitted reports, reporting manipulation, and extra-statutory interference;*
- **E. ORDERING** *the appointment of a qualified, neutral successor Patient Care Ombudsman pursuant to 11 U.S.C. § 333; and*

*Granting such other and further relief as this Court deems just and proper.*

Respectfully Submitted by

Sharon Marie Travis
950 Main Street Apt 303
Wheeling, WV 26003
mcblessedbygod@gmail.com

FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

In re: Heart 2 Heart Volunteers, Inc.,
*Debtor.*
Case No. 5:25-bk-
Chapter 11

I, Ms. Travis, hereby certify under penalty of perjury that on this 8th day of August, 2026, I served a true and correct copy of the foregoing *Notice of Motion, Motion for Reconsideration,* and *[Proposed] Order* via the Court's Electronic Case Filing (ECF/CM) system and/or by depositing the same in the United States Mail, first-class postage prepaid, addressed to the following parties of record:
Chapter 11 Trustee:

Robert Johns
Johns & Associates, PLLC 101 Brook Hill Drive Charleston, WV 25311

Counsel for the Chapter 11 Trustee:
BRIAN R. BLICKENSTAFF [WVSB No. 9449] Johns & Associates, PLLC 101 Brook Hill Drive Charleston, WV 25311

Counsel for the Debtor:
KIRK B. BURKLEY, ESQ. Bernstein-Burkley, P.C. 707 Grant Street Suite 2200 Gulf Tower Pittsburgh

The Patient/Administrative Ombudsman:
Deborah Fish-Patient Care Ombudsman
211 West Fort Street
Suite 705
Detroit, MI 48226

Office of the United States Trustee:
GARY O. KINDER, ESQ. Assistant U.S. Trustee 300 Virginia Street East, Room 2025 Charleston, WV 25307

Dated: August 13, 2026 - Respectfully Submitted- Sharon Marie Travis

*[This certification must be appended to your document if its length is calculated by maximum number of words or lines of text rather than number of pages.]*

## Certificate of Compliance with Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

1. This document complies with [the type-volume limit of Fed. R. Bankr. P. [*insert Rule citation; e.g.,8015(a)(7)(B)*]] [the word limit of Fed. R. Bankr. P. [*insert Rule citation; e.g., 8013(f)(3)(A)*]] because, excluding the parts of the document exempted by Fed. R. Bankr. P. 8015(g) [and [*insert applicable Rule citation, if any*]]:

12687

☑ this document contains [*state the number of*] words, **or**

☐ this brief uses a monospaced typeface and contains [*state the number of*] lines of text.

2. This document complies with the typeface requirements of Fed. R. Bankr. P. 8015(a)(5) and the type-style requirements of Fed. R. Bankr. P. 8015(a)(6) because:

☑ this document has been prepared in a proportionally spaced typeface using [*state name and version of word-processing program*] in [*state font size and name of type style*], **or**

Micro Soft word in 14 Times new Roman

☐ this brief has been prepared in a monospaced typeface using [*state name and version of word-processing program*] with [*state number of characters per inch and name of type style*].

Sharon Travis (signature) Date: 8/24/2026

Signature

Print name of person signing certificate of compliance:

Sharon Travis